1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   Post Montgomery Center
3  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
4  Telephone: 415/288-4545
   415/288-4534 (fax)
5  shawnw@rgrdlaw.com
     – and –
6  DARREN J. ROBBINS (168593)
   DAVID C. WALTON (167268)
7  655 West Broadway, Suite 1900
   San Diego, CA  92101-3301
8  Telephone: 619/231-1058
   619/231-7423 (fax)
9  darrenr@rgrdlaw.com
   davew@rgrdlaw.com
10
   Attorneys for Plaintiff
11
   [Additional counsel appear on signature page.]
12

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15                   SOUTHERN DIVISION

16  ARUN BONDALI, Individually and on  )   VIA FAX
    Behalf of All Others Similarly Situated, )
17                                     )   No. SACV13 - 00117 JST (JPRx)
                            Plaintiff,  )
18                                     )   CLASS ACTION
           vs.                         )
19                                     )   COMPLAINT FOR VIOLATIONS OF
    YUM! BRANDS, INC., DAVID C.         )   THE FEDERAL SECURITIES LAWS
20  NOVAK, PATRICK GRISMER, JING-       )
    SHYH S. SU and RICHARD T.          )
21  CARUCCI,                           )
                                       )
22                         Defendants.  )
                                       )   DEMAND FOR JURY TRIAL
23  ─────────────────────────────────
24
25
26
27
28

**JURISDICTION AND VENUE**

1.     Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the Securities Exchange Act of 1934 ("1934 Act").  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

2.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) as defendants transact substantial business in this district.  Yum! Brands, Inc.'s ("Yum" or the "Company") Taco Bell U.S. Division is headquartered in this district.  Yum's China Division, headquartered in Shanghai, China, its Yum! Restaurants International Division, headquartered in Dallas, Texas, and its Taco Bell U.S. Division represent 90% of the Company's operating profit.

**INTRODUCTION**

3.     Plaintiff makes the following allegations, except as to allegations specifically pertaining to plaintiff and plaintiff's counsel, based upon the investigation undertaken by plaintiff's counsel, including analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Yum, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**SUMMARY OF THE ACTION**

4.     This is a securities class action on behalf of all persons who purchased or otherwise acquired Yum publicly traded securities between October 9, 2012 and January 7, 2013, inclusive (the "Class Period"), against Yum and certain of its officers and/or directors, including the Company's Chairman and Chief Executive Officer ("CEO"), David C. Novak ("Novak"), Vice Chairman of the Board of Directors and CEO of Yum! Restaurants China, Jing-Shyh S. Su ("Su"), President, Richard T.

1  Carucci ("Carucci"), and Chief Financial Officer, Patrick Grismer ("Grismer")
2  (collectively, the "Individual Defendants"), for violations of the 1934 Act.

3  **BACKGROUND**

4  5.     Yum describes itself as the world's largest quick service restaurant
5  company based on number of system units, with approximately 37,000 units in more
6  than 120 countries and territories.  Through the three concepts of KFC, Pizza Hut and
7  Taco Bell, the Company develops, operates, franchises and licenses a worldwide
8  system of restaurants.

9  6.     Yum's business consists of four reporting segments: the China Division,
10 the India Division, Yum! Restaurants International ("YRI" or the "International
11 Division"), and the United States Division.  The China Division includes only
12 mainland China, and YRI includes the remainder of the Company's international
13 operations.  The China Division, YRI and the Company's Taco Bell U.S. Division
14 now represent approximately 90% of the Company's operating profits, excluding
15 corporate and unallocated income and expenses.  The China Division, with its
16 headquarters in Shanghai, China, comprises approximately 4,500 system restaurants,
17 primarily Company-owned KFCs and Pizza Huts.  YRI, based in Dallas, Texas,
18 comprises approximately 14,500 system restaurants, primarily franchised KFCs and
19 Pizza Huts, operating in over 120 countries outside the United States.  Taco Bell
20 leases its corporate headquarters and research facility in Irvine, California.  The KFC
21 U.S. and Yum corporate headquarters and a research facility in Louisville, Kentucky
22 are owned by the Company.

23 **OVERVIEW**

24 7.     During the Class Period, the defendants made materially false and
25 misleading statements concerning the Company's current and future business and
26 financial condition.  In particular, beginning on October 9, 2012, the Company
27 reported its financial results for its fiscal 2012 third quarter.  In addition to reporting
28 strong sales and earnings per share ("EPS") growth, including same-store sales growth

in China where the economy was slowing and the Company was predicting low single-digit or flat fourth quarter growth, the Individual Defendants caused the Company to raise its fiscal year EPS growth forecast to at least 13%. According to Yum's CEO, defendant Novak:

> *"Very strong sales and profit at all of our divisions, including China, Yum! Restaurants International, India and the U.S., drove 19% third-quarter EPS growth. Given the strength of our year-to-date results, I'm pleased to report we are raising our full-year EPS growth forecast to at least 13%, excluding Special Items."*

8.     Following the October 9, 2012 announcement of Yum's financial results and its increased fiscal 2012 EPS growth forecast, Yum's stock price leaped over 7% from a close of $66.04 per share to $70.99 per share on October 10, 2012.

9.     Then, on November 23, 2012, reports in the Chinese media disclosed that certain of the Company's chicken suppliers had been feeding toxic chemicals to chickens sold to KFC China.

10.     On November 29, 2012, the Company announced that its October 9, 2012 forecast of single-digit to flat China Division same-store sales growth would not be met, but instead, the Company expected to report China Division same-store sales of -4%. The Company nevertheless maintained that it remained on track to deliver at least 13% EPS growth:

> David C. Novak . . . said, *"I'm pleased to report we remain on track to deliver at least 13% EPS growth this year."*
>
> *              *              *
>
> —     *Same-store sales in the fourth quarter are expected to be +4% at YRI, +3% in the U.S., and -4%* in China

11.     On these disclosures concerning the China Division's same-store sales declines, Yum's stock price fell nearly 9% on massive volume from a close of $74.47 per share on November 29, 2012 to $67.08 per share on November 30, 2012.

1    12.    On December 20 and 21, 2012, news reports began to circulate that the

2  Company knew well before the Class Period that certain chicken suppliers in China

3  had injected chickens with excessive antibiotics and other illegal chemicals but sought

4  to conceal these facts:

5          *BACK in 2010, Yum Brands Inc, the world's largest restaurant*

6          *company and owner of KFC, found excessive antibiotics in chicken*

7          *from a supplier but didn't report it and kept on buying the tainted*

8          *chicken, Shanghai's food safety office said yesterday.*

9                          *       *       *

10          *[Shandong] Liuhe [the supplier] had bought the problem*

11          *products from several farms where chickens were fed chemicals laced*

12          *with illegal medicine and 18 kinds of antibiotics to keep them alive and*

13          *boost their growth, China Central Television reported earlier.*

14          *Reports showing that the chicken . . . contained excessive*

15          *antibiotics were sent to the company by the institute, but neither the*

16          *company nor the institute reported the problem to the city government,*

17          *food safety officials said.*

18          *Instead, Yum Brands kept buying chicken products from Liuhe*

19          *until August this year, the report said.*

20    13.    As a result of the December 20 and 21, 2012 disclosures, Yum's stock

21  price declined 5% from a close of $67.16 per share on December 19, 2012 to $63.88

22  per share on December 21, 2012.

23    14.    On January 7, 2013, the Company filed a Form 8-K with the SEC

24  updating its full year 2012 guidance for same-store sales for its China Division, stating

25  that it was lowering its financial outlook due to publicity surrounding the Chinese

26  government's review of its poultry supply:

27

28

Item 2.02 Results of Operations and Financial Condition

Due to adverse publicity associated with a government review of China poultry supply – and the corresponding significant impact on KFC China sales during the last two weeks of December – *we now expect China Division same-store sales to be -6% for the fourth quarter of 2012, versus our previous forecast of -4%.* The Company expects full-year 2012 earnings per share, excluding Special Items, of approximately $3.24. We do not anticipate providing any further updates or commentary until our scheduled earnings release on February 4, 2013.

15.   As a result of the January 7, 2013 disclosures, on January 8, 2013, Yum shares dropped 5% on high volume from $67.89 per share to as low as $64.40 per share.

16.   The representations by defendants concerning the Company's current business and financial condition, including its forecasted financial results, were each materially false and misleading when made, because defendants failed to disclose the following true facts which were known to defendants or recklessly disregarded:

(a)   Slowing economic trends in China were stronger than reported and could not support the forecasted sales results for the Company's China Division nor the Company-wide increased EPS growth;

(b)   Defendants knew but concealed that Yum's own food safety inspections had already found that Chinese chicken supplier Shandong Liuhe Group ("Shandong Liuhe") had sold the Company chickens with high levels of antibiotics and other illegal drugs and/or chemicals; and

(c)   The Company had continued to buy products from Shandong Liuhe until as late as August 2012.

**INSIDER TRADING**

17.   During the Class Period, while the Company's share price was artificially inflated due to defendants' materially false and misleading statements and omissions,

Company insiders, including defendants Novak and Su, unloaded 859,660 shares of their Yum stock for proceeds of $57.6 million.

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Novak | 10-Dec-2012 | 540,600 | $66.20 | $35,787,720 |
| | | | | |
| Su | 10-Dec-2012 | 49,475 | $66.02 | $3,266,340 |
| Su | 28-Dec-2012 | 49,475 | $65.06 | $3,218,844 |
| | Total | 98,950 | | $6,485,183 |
| | | | | |
| Bergren | 02-Nov-2012 | 27,632 | $73.16 | $2,021,557 |
| Bergren | 06-Nov-2012 | 24,400 | $73.07 | $1,782,908 |
| Bergren | 26-Nov-2012 | 26,439 | $73.24 | $1,936,392 |
| | Total | 78,471 | | $5,740,857 |
| | | | | |
| Blum | 01-Nov-2012 | 3,151 | $72.59 | $228,731 |
| Blum | 10-Dec-2012 | 2,956 | $66.20 | $195,687 |
| Blum | 02-Jan-2013 | 3,244 | $67.08 | $217,608 |
| | Total | 12,343 | | $843,088 |
| | | | | |
| Byerlein-Hollan | 10-Dec-2012 | 42,098 | $66.36 | $2,793,623 |
| | | | | |
| Carucci | 13-Dec-2012 | 54,200 | $67.86 | $3,678,012 |
| | | | | |
| Eaton | 17-Oct-2012 | 35,990 | $71.33 | $2,567,167 |
| | | | | |
| | TOTAL | 859,660 | | $57,694,589 |

## PARTIES

18.    Plaintiff Arun Bondali purchased or acquired Yum publicly traded securities as described in the attached certification and was damaged by the conduct alleged herein.

19.    Defendant Yum is incorporated in North Carolina and trades on the New York Stock Exchange ("NYSE") under the symbol "YUM." The Company's China Division is headquartered in Shanghai, China. The Company's Taco Bell U.S. headquarters are located in Irvine, California. The Company's International Division is headquartered in Dallas, Texas, and the Company's corporate headquarters are located in Louisville, Kentucky.

20.     Defendant Novak is and was, at all relevant times during the Class Period, Chairman of the Board of Directors and CEO of the Company.

21.     Defendant Grismer is and was, at all relevant times during the Class Period, the Chief Financial Officer ("CFO") of the Company.

22.     Defendant Su is and was, at all relevant times during the Class Period, Vice Chairman of the Board of Directors and CEO of Yum! Restaurants China.

23.     Defendant Carucci is and was, at all relevant times during the Class Period, President of the Company.

24.     The defendants named in ¶¶20-23 are referred to herein as the "Individual Defendants."

## CONTROL PERSONS

25.     As officers and controlling persons of a publicly held company whose common stock was and is traded on the NYSE and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Yum, each of the Individual Defendants had access to the adverse undisclosed information about the Company's financial

condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Yum and its business or adopted by the Company materially false and misleading.

27.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.    Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

28.    The Company and the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Yum publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme: (i) deceived the investing public regarding Yum's business, operations, management and the intrinsic value of Yum securities; (ii) allowed Company insiders, including defendants Novak and Su, to sell their Yum common stock at artificially inflated prices for proceeds of $57.6 million; and (iii) caused plaintiff and other members of the Class to purchase Yum securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

29.    On October 9, 2012, the Company issued its financial results for its fiscal 2012 third quarter and increased its full year 2012 EPS growth forecast to at least 13%:

**Yum! Brands Reports Third-Quarter EPS Growth of 19%, Excluding Special Items; Strong Sales and Operating Profit**

**Performance Across All Divisions; Raises Full-Year 2012 EPS Growth Forecast to at least 13%**

. . . Yum! Brands Inc. today reported results for the third quarter ended September 8, 2012 including EPS of $0.99, excluding Special Items. Reported EPS for the quarter was $1.00. *Yum! raises full-year EPS growth forecast to at least 13%, or at least $3.24, excluding Special Items.*

**THIRD-QUARTER HIGHLIGHTS**

- Worldwide operating profit grew 18%, prior to foreign currency translation, including 22% in China, 14% at Yum! Restaurants International (YRI) and 13% in the U.S. Worldwide operating profit increased 16%, after foreign currency translation.

- Worldwide restaurant margin increased 1.9 percentage points to 18.9%, including increases of 0.1 percentage points in China, 1.0 percentage point at YRI and 4.6 percentage points in the U.S. Restaurant margin increased 0.6 percentage points in China excluding Little Sheep.

- Worldwide system sales grew 6%, prior to foreign currency translation, including 22% in China, 4% at YRI and 1% in the U.S.
  - Worldwide system sales growth was 8%, excluding the acquisition of Little Sheep and the 2011 divestiture of Long John Silver's and A&W All-American Restaurants, including 19% in China, 5% at YRI and 6% in the U.S.

- Same-store sales grew 6% in China, 2% at YRI and 6% in the U.S. YRI same-store sales were negatively impacted by 1 percentage point due to the timing of Ramadan.

1       • Strong international development continued with 394 new

2  restaurants opened, including 192 new units in China and 181 new units

3  at YRI; 86% of this development occurred in emerging markets.

4                      *         *         *

5  **Full-year EPS growth forecast raised to at least 13%, or at least**

6  **$3.24, excluding Special Items**.

7                      *         *         *

8       David C. Novak, Chairman and CEO, said, "***Very strong sales***

9  ***and profit at all of our divisions, including China, Yum! Restaurants***

10  ***International, India and the U.S., drove 19% third-quarter EPS***

11  ***growth. Given the strength of our year-to-date results, I'm pleased to***

12  ***report we are raising our full-year EPS growth forecast to at least 13%,***

13  ***excluding Special Items***.

14       In China, our category-leading brands and competitive positions

15  are stronger than ever. China system sales grew 22% as we opened 192

16  new restaurants and delivered same-store sales growth of 6%; operating

17  profit grew 22%, prior to foreign currency translation. . . .

18       ***We expect 2012 to be our eleventh consecutive year of delivering***

19  ***at least 13% EPS growth, prior to Special Items***. Our consistent track

20  record is evidence that Yum! Brands is capable of delivering strong

21  double-digit growth even in the most challenging economic times. We

22  expect this to continue as we build on our track record of at least 10%

23  EPS growth in 2013 and well into the future."

24       30.    On October 10, 2012, the Company held a conference call for analysts

25  and investors to discuss the fiscal 2012 third quarter financial results. The call was

26  hosted by defendants Novak, Carucci and Grismer:

27       [NOVAK:] ***I am obviously very proud of our China team's***

28  ***continued strong performance. For the third quarter operating profit***

1    *grew 22% prior to foreign currency translations, units expanded 18%,*
2    *and system sales grew 22%.*   Importantly, and as we predicted,
3    restaurant-level margins improved dramatically compared to our second
4    quarter.  Same-store sales grew at a healthy rate of 6% with transactions
5    down 1%.

6        Keep in mind this is overlapping 19% same-store sales growth
7    with transaction growth of 27% during the third quarter of last year.
8    When you do the math, our two-year same-store sales growth is an
9    impressive 26% with two-year same-store transaction growth of 26% as
10   well.

11                    *       *       *

12   [GRISMER:]  To start, I would like to thank our operating divisions for
13   their outstanding third-quarter performance as 19% EPS growth,
14   excluding special items, was led by an impressive 18% growth in
15   operating profit prior to foreign currency translation.

16                    *       *       *

17   You will recall that China margin was down 4 percentage points in the
18   second quarter compared to prior year.  As we expected, this trend
19   reversed in the third quarter with margin improving modestly over prior
20   year due to phased pricing actions and lower inflation.

21                    *       *       *

22       Now I'm going to talk about our expectations for the fourth
23   quarter.   In China we anticipate modest year-over-year margin
24   improvement in Q4 similar to what we saw in the third quarter.  This
25   margin improvement and continued strength in new unit development
26   should deliver solid double-digit profit growth for China in the fourth
27   quarter.

28

1    I am sure many of you are interested to know how same-store
2    sales are currently trending in China.  Remember, our overlap is two
3    points higher as we move into the fourth quarter with same-store sales
4    growth of 21% last year, so we do expect comps to moderate further.
5    Additionally, Q4 is our longest fiscal quarter and with three months
6    remaining in a volatile and slowing economy sales are tough to predict.
7    At this point our best estimate is that China same-store sales will be low
8    single digits to flat in Q4.

9                              *        *        *

10    In summary, for the full year we are expecting significant profit
11    growth from each of our divisions led by strong sales performance across
12    our entire business.  Therefore, *we are raising our full-year EPS growth*
13    *forecast to at least 13%, excluding special items, marking the 11th*
14    *consecutive year we are expecting to deliver at least 13% EPS growth.*
15    *Considering the challenging global economy, I am very pleased with*
16    *our performance and the overall quality of our earnings growth in*
17    *2012.*

18         31.    The representations by defendants concerning the Company's current
19    business and financial condition, including its forecasted financial results, were each
20    materially false and misleading when made because defendants failed to disclose the
21    following true facts which were known to defendants or recklessly disregarded:

22                (a)    Slowing economic trends in China were stronger than reported and
23    could not support the forecasted sales results for the Company's China Division nor
24    the Company-wide increased EPS growth;

25                (b)    Defendants knew but concealed that the Company's own food
26    safety inspections had already found that Chinese chicken supplier Shandong Liuhe
27    had sold the Company chickens with high levels of antibiotics and other illegal drugs
28    and/or chemicals; and

1        (c)    The Company had continued to buy products from Shandong

2   Liuhe until as late as August 2012.

3        32.    Nevertheless, following the October 9, 2012 announcement of Yum's

4   financial results and increased fiscal 2012 EPS growth forecast and the October 10,

5   2012 conference call, Yum's stock price leaped over 7% from a close of $66.04 per

6   share to $70.99 per share on October 10, 2012.

7                    **THE TRUE FACTS BEGIN TO BE DISCLOSED**

8        33.    On November 23, 2012, reports published in the Chinese media claimed

9   that one of KFC China's chicken suppliers was feeding chickens toxic chemicals in

10  order to accelerate the chickens' growth cycle from 100 days to 45 days.  According

11  to *Forbes*, on the same day, KFC China responded to the news reports claiming that

12  45 days is the industry standard.

13       34.    On November 29, 2012, the Company issued a press release announcing

14  its initial financial forecast for fiscal year 2013 and reaffirming EPS guidance for its

15  fiscal year 2012.  However, the Company disclosed that same-store sales growth in its

16  China Division would decline 4% year-over-year:

17       **Yum! Brands Announces Full-Year 2013 Expectations; Reconfirms**

18       **Full-Year 2012 EPS Growth Forecast of at least 13%; Will Host**

19       **Investor Update Meeting Thursday, December 6, 2012**

20            . . . Yum! Brands Inc., in advance of its Annual Investor Meeting,

21       reconfirms its full-year 2012 EPS growth forecast of at least 13%, or

22       $3.24 per share, excluding Special Items.  Yum! also announces it

23       expects to once again deliver at least 10% EPS growth in 2013,

24       excluding Special Items, which would mark twelve consecutive years of

25       meeting or exceeding this annual EPS growth target.

26            David C. Novak, Chairman and CEO, said, "***I'm pleased to report***

27       ***we remain on track to deliver at least 13% EPS growth this year***.  Our

28       2012 EPS growth is driven by double-digit operating profit growth, prior

                                    - 13 -

to foreign currency translation, in all three of our major operating divisions: China, Yum! Restaurants International and the U.S. Solid same-store sales growth at each of our divisions and record international new-unit development highlight the quality of our growth.

*For the fourth quarter, stronger than expected operating performance from Yum! Restaurants International and our U.S. division is offsetting softer sales in China, where we now expect same-store sales to be negative as we overlap 21% same-store sales growth from last year. Full-year same-store sales growth in China is expected to be 6%.*

\*          \*          \*

**Q4 2012 UPDATE**

- Strong momentum leads to record international development of at least 1,850 new units for the year, including at least: 800 new units in China, 950 at Yum! Restaurants International (YRI), and 100 at Yum! Restaurants India

- *Same-store sales in the fourth quarter are expected to be +4% at YRI, +3% in the U.S., and -4%* in China

\*          \*          \*

- The fourth quarter will include an overlap headwind due to an additional week in our 2011 fiscal year which produced a combined $26 million operating profit benefit to the U.S. and YRI

35.    On these disclosures concerning the China Division's same-store sales declines, Yum's stock price fell nearly 9% on massive volume from a close of $74.47 per share on November 29, 2012 to $67.08 per share on November 30, 2012.

36.    On December 20, 2012, *English.Eastday.com*, citing as its source the *Shanghai Daily*, reported that defendants knew in 2010 that chickens purchased from

- 14 -

Shandong Lihue were found to have excessive antibiotics, but nevertheless continued to buy products from Shandong Lihue until August 2012:

### Yum knew in 2010 chicken tainted

*BACK in 2010, Yum Brands Inc, the world's largest restaurant company and owner of KFC, found excessive antibiotics in chicken from a supplier but didn't report it and kept on buying the tainted chicken, Shanghai's food safety office said yesterday.*

The company and the Shanghai Institute for Food and Drug Control, a government institute paid by the company to test its chicken products, will receive the "strictest punishment" if they are found to have broken food safety laws, the food safety office said yesterday in an investigation report on the "instant chicken."

Yum Brands Inc signed a contract with SIFDC in August 2005 to serve as a third-party inspection body to test the quality of raw produce from suppliers.

The company sent samples to the institute every two months and paid several million yuan a year for the service, Shanghai Television reported. *The food safety office report said that from 2010 to 2011, a total of eight out of 19 batches of chicken the company purchased from the Shandong Liuhe Group were found to have excessive levels of antibiotics.*

*Liuhe had bought the problem products from several farms where chickens were fed chemicals laced with illegal medicine and 18 kinds of antibiotics to keep them alive and boost their growth, China Central Television reported earlier.*

*Reports showing that the chicken . . . contained excessive antibiotics were sent to the company by the institute, but neither the*

1   *company nor the institute reported the problem to the city government,*
2   *food safety officials said.*

3       ***Instead, Yum Brands kept buying chicken products from Liuhe***
4   ***until August this year, the report said.***  The company said they stopped
5   buying not because of food safety problems but due to "adjustment of
6   strategic layout," according to STV.

7       *"**The company should have taken action as soon as it found***
8   ***problems in its raw materials.   It should have reported to the city***
9   ***government, tightened management of its supplier or just stopped***
10  ***purchasing products from it,**"* said Gu Zhenhua, deputy director with the
11  food safety office.

12      The office said it was inspecting 32 samples from eight kinds of
13  poultry products from Yum Brands' Shanghai logistics center.

14      Yum Brands told STV that it was still investigating the situation.

15      While the eventual destination of the eight batches of problem
16  chicken found in 2010 and 2011 is still being investigated, STV said they
17  might have been sold to KFC customers in Shanghai.

18      KFC told STV they had found unqualified products from the
19  supplier in 2010 and they had been returned or sealed up to be destroyed.
20  It said it stopped purchasing from Liuhe in 2011.

21      ***However, an STV investigation found KFC was still buying***
22  ***chicken from the company on May 3 this year – more than 30,000***
23  ***kilograms of chicken wings in 1,000 boxes, according to its purchasing***
24  ***reports.***  It was not known whether the chicken wings were sold to
25  customers or sealed, STV reported.

26      On Wednesday, food safety authorities in Qingdao City closed
27  farms where chickens were said to have been fed illegal drugs and
28  antibiotics.

1           Two slaughterhouses of the Shandong Liuhe Group and Yingtai

2    Co were also ordered to halt production.

3        37.    On December 21, 2012, *WantChinaTimes.com* published a report entitled

4   "KFC suspected of concealing results of food safety tests."   The article further

5   detailed Yum's and its Chinese subsidiary's relationship with Shandong Liuhe and

6   concealment of known food safety tests, which had found excessive levels of

7   antibiotics and growth hormones:

8           KFC in China has been unable to put to rest recent controversy

9         over tainted poultry after Guangzhou's 21st Century Business Herald

10        reported that as early as 2010 KFC had found through its own

11        investigations that some of its poultry contained excessively high levels

12        of antibiotics. A third-party inspection confirmed large amounts of

13        antibiotics and growth hormones in chickens supplied by Liuhe Group in

14        Shandong province.

15         ***The fast-food chain did not immediately terminate its contract***

16        ***with Liuhe, but in August this year its name was removed from its list***

17        ***of KFC's suppliers. KFC said in a public statement this week that***

18        ***Liuhe was terminated for reasons other than food safety, which has led***

19        ***to suspicion that it has been attempting to conceal the results of tests.***

20                      *     *     *

21           According to the 21st Century Business Herald, from August this

22        year to the present, neither KFC nor parent company Yum! Brands

23        websites or other official channels have announced the results of self-

24        conducted tests on antibiotics in its chicken. Liuhe previously provided

25        KFC, which operates thousands of franchises nationwide, an average of

26        40 to 50 tons of chicken per month, according to a report by state

27        broadcaster CCTV.

28

Zheng Fengtian, an expert on food safety with Renmin University of China, said that based on an announcement by China's quality and safety watchdog on food recall management guidelines, KFC should upon discovering high levels of antibiotics in its products take the initiative to issue a recall or face administrative penalties.

38.     On December 21, 2012, the Company issued a statement concerning the Chinese Government's investigation into the safety of the poultry products served in its restaurants.  The response stated as follows:

We're cooperating fully with the Chinese government's review of two poultry suppliers who provided chicken with unapproved levels of antibiotics to KFC.  These suppliers represent an extremely small percentage of product to KFC.  As such, we do not anticipate a shortage of product supply.  Recent publicity has resulted in moderate sales impact the past few days.  We take food safety very seriously and the China team is diligently working to resolve this issue.

39.     As a result of the December 20 and 21, 2012 disclosures, Yum's stock price declined 5% from a close of $67.16 per share on December 19, 2012 to $63.88 per share on December 21, 2012.

40.     On December 24, 2012, *Reuters* reported that the Shanghai Food and Drug Administration said that the levels of antibiotics and steroids were within official limits but that some chicken contained the drug amantadine, a drug used to treat Parkinson's disease, which is banned in foods and has directed Yum to recall products from its KFC restaurants.  The article stated:

**Yum's China chicken antibiotics within limits: Shanghai government**

. . . Shanghai's food safety authority has said the level of antibiotics and steroids in Yum Brands Inc's KFC chicken was within

- 18 -

official limits, but the watchdog found a suspicious level of an antiviral drug in one of the eight samples tested.

The Shanghai Food and Drug Administration said in a statement dated on Friday that a sample contained suspicious levels of amantadine, a drug used to treat Parkinson's disease. The watchdog said the drug is banned for use in food.

The safety authority has asked Yum to recall related products from its KFC restaurants and has launched a city-wide inspection of KFC outlets, it said.

The Shanghai inspection comes after state-run China Central Television reported last week that some of KFC's chickens had high levels of antibiotics.

41. On January 7, 2013, the Company filed a Form 8-K with the SEC updating its full year 2012 EPS growth guidance, stating that it was lowering its financial outlook due to publicity surrounding the Chinese government's review of its poultry supply:

Item 2.02   Results of Operations and Financial Condition

Due to adverse publicity associated with a government review of China poultry supply – and the corresponding significant impact on KFC China sales during the last two weeks of December – *we now expect China Division same-store sales to be -6% for the fourth quarter of 2012, versus our previous forecast of -4%.* The Company expects full-year 2012 earnings per share, excluding Special Items, of approximately $3.24. We do not anticipate providing any further updates or commentary until our scheduled earnings release on February 4, 2013.

42. On January 7, 2013, *Fox Business* published an article, entitled "Yum Brands Cuts Outlook Citing Chicken Probe Backlash," concerning the Company's disclosure that it would report lower earnings for fiscal 2012:

*Yum Brands (YUM), the parent of KFC, Taco Bell and Pizza Hut, lowered its fourth-quarter sales and fiscal-year 2012 earnings outlook late Monday citing an ongoing probe regarding the quality of its chicken in China.*

The Louisville, Ky.-based company blamed the bleak view on "adverse publicity associated with a government review of China poultry supply – and the corresponding significant impact on KFC China sales during the last two weeks of December."

*Yum now sees same-store sales, a key growth metric measuring sales at stores open longer than a year, falling 6% in its China division, below its earlier outlook of a decline of 4%.*

For the full-year 2012, it now sees earnings excluding special items of $3.24, edging two cents below average analyst estimates in a Thomson Reuters poll.

43.   As a result of the January 7, 2013 disclosures, on January 8, 2013, Yum shares dropped 5% on high volume, falling from $67.89 per share to as low as $64.40 per share.

44.   The Class Period representations by defendants concerning the Company's current business and financial condition, including its forecasted financial results, were each materially false and misleading when made, because defendants failed to disclose the following true facts which were known to defendants or recklessly disregarded:

(a)   Slowing economic trends in China were stronger than reported and could not support the forecasted sales results for the Company's China Division nor the Company-wide increased EPS growth;

(b)   Defendants knew but concealed that Yum's own food safety inspections had already found that Chinese chicken supplier Shandong Liuhe had sold

- 20 -

1   the Company chickens with high levels of antibiotics and other illegal drugs and/or

2   chemicals; and

3              (c)    The Company had continued to buy products from Shandong

4   Liuhe until as late as August 2012.

5       45.    The market for Yum publicly traded securities was open, well-developed

6   and efficient at all relevant times.  As a result of these materially false and misleading

7   statements and omissions as set forth above, Yum securities traded at artificially

8   inflated prices during the Class Period. Plaintiff and other members of the Class (as

9   defined below) purchased or otherwise acquired Yum securities relying upon the

10  integrity of the market prices of Yum securities and market information relating to

11  Yum, and have been damaged thereby.

12      46.    During the Class Period, defendants materially misled the investing

13  public, thereby inflating the prices of Yum publicly traded securities, by publicly

14  issuing false and misleading statements and omitting to disclose material facts

15  necessary to make defendants' statements, as set forth herein, not false and

16  misleading.  Said statements and omissions were materially false and misleading in

17  that they failed to disclose material adverse information and misrepresented the truth

18  about the Company, its business and operations, as alleged herein.

19      47.    At all relevant times, the material misrepresentations and omissions

20  particularized in this complaint directly or proximately caused or were a substantial

21  contributing cause of the damages sustained by plaintiff and other members of the

22  Class. As described herein, during the Class Period, defendants made or caused to be

23  made a series of materially false or misleading statements about Yum's business,

24  prospects and operations.  These material misstatements and omissions had the cause

25  and effect of creating, in the market, an unrealistically positive assessment of Yum

26  and its business, prospects and operations, thus causing the Company's securities to be

27  overvalued and artificially inflated at all relevant times. Defendants' materially false

28  and misleading statements during the Class Period resulted in plaintiff and other

members of the Class purchasing the Company's publicly traded securities at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the prices of Yum securities was removed and the prices of Yum securities declined dramatically, causing losses to plaintiff and the other members of the Class.

### ADDITIONAL SCIENTER ALLEGATIONS

48.     As alleged herein, Yum and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Yum, their control over, and/or receipt and/or modification of Yum's allegedly materially misleading statements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Yum, participated in the fraudulent scheme alleged herein.

### LOSS CAUSATION/ECONOMIC LOSS

49.     During the Class Period, as detailed herein, defendants made false and misleading statements about Yum's business and prospects and engaged in a scheme to deceive the market. This artificially inflated the prices of Yum's securities and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the prices of Yum's securities fell precipitously, as the prior artificial inflation came out of the prices of the securities over time. As a result of their purchases of Yum publicly traded securities during the Class period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**NO SAFE HARBOR**

50.     Yum's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

51.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Yum who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

52.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- 23 -

(e)     Plaintiff and other members of the Class purchased Yum securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

53.     At all relevant times, the market for Yum common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Yum filed periodic public reports with the SEC; and

(b)     Yum regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

54.     Plaintiff incorporates ¶¶1-53 by reference.

55.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Yum publicly traded securities during the Class Period.

57.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Yum publicly traded securities.  Plaintiff and the Class would not have purchased Yum publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

58.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Yum publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

59.     Plaintiff incorporates ¶¶1-58 by reference.

60.     The Individual Defendants acted as controlling persons of Yum within the meaning of §20 of the 1934 Act.  By virtue of their positions and their power to control public statements about Yum, the Individual Defendants had the power and ability to control the actions of Yum and its employees.  Yum controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

61.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or acquired Yum publicly traded securities during the Class Period (the "Class").  Excluded from the Class are defendants and their family members, directors and officers of Yum and their families and affiliates.

1    62.    The members of the Class are so numerous that joinder of all members is

2  impracticable.  The disposition of their claims in a class action will provide substantial

3  benefits to the parties and the Court.  Yum has more than 451 million shares of stock

4  outstanding, owned by thousands of persons.

5    63.    There is a well-defined community of interest in the questions of law and

6  fact involved in this case. Questions of law and fact common to the members of the

7  Class which predominate over questions which may affect individual Class members

8  include:

9        (a)    Whether the 1934 Act was violated by defendants;

10        (b)    Whether defendants omitted and/or misrepresented material facts;

11        (c)    Whether defendants' statements omitted material facts necessary in

12  order to make the statements made, in light of the circumstances under which they

13  were made, not misleading;

14        (d)    Whether defendants knew or recklessly disregarded that their

15  statements were false and misleading;

16        (e)    Whether the prices of Yum publicly traded securities were

17  artificially inflated; and

18        (f)    The extent of damage sustained by Class members and the

19  appropriate measure of damages.

20    64.    Plaintiff's claims are typical of those of the Class because plaintiff and

21  the Class sustained damages from defendants' wrongful conduct.

22    65.    Plaintiff will adequately protect the interests of the Class and has retained

23  counsel who are experienced in class action securities litigation.  Plaintiff has no

24  interests which conflict with those of the Class.

25    66.    A class action is superior to other available methods for the fair and

26  efficient adjudication of this controversy.

27                              **PRAYER FOR RELIEF**

28    WHEREFORE, plaintiff prays for judgment as follows:

- 26 -

1    A.    Determining that this action is a proper class action, designating plaintiff

2 as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the

3 Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

4    B.    Awarding plaintiff and the members of the Class damages and interest;

5    C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

6    D.    Awarding such equitable/injunctive or other relief as the Court may deem

7 just and proper.

**JURY DEMAND**

9    Plaintiff demands a trial by jury.

10 DATED: January 24, 2013

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS

SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: 415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

BOTTINI & BOTTINI, INC.
FRANCIS A. BOTTINI
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA  92037
Telephone: 858/914-2001
858/914-2002 (fax)
fbottini@bottinilaw.com

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Yum Brands.doc

- 27 -

## CERTIFICATION OF NAMED PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Arun Bondali, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.  I have reviewed the complaint with my counsel and authorized its filing.

2.  I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.  I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.  My purchases and sales of the securities of Yum! Brands, Inc. during the Class Period are as follows:

| Date | Transaction |
|---|---|
| 11/29/2012 | Bought 100 YUM @ 71.86 |
| 11/29/2012 | Bought 100 YUM @ 71.3 |
| 11/29/2012 | Bought 100 YUM @ 71.11 |
| 11/29/2012 | Bought 100 YUM @ 70.55 |
| 11/29/2012 | Bought 100 YUM @ 69.7 |
| 11/29/2012 | Sold 100 YUM @ 69.88 |
| 11/30/2012 | Bought 100 YUM @ 69.1 |
| 12/10/2012 | Sold 100 YUM @ 66.2801 |

5.  I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 18th day of January, 2013.

_____   23 Jan 2013

Arun Bondali

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Jean P. Rosenbluth.

The case number on all documents filed with the Court should read as follows:

## SACV13- 117 JST (JPRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
   **312 N. Spring St., Rm. G-8**
   **Los Angeles, CA 90012**

[ ] **Southern Division**
   **411 West Fourth St., Rm. 1-053**
   **Santa Ana, CA 92701-4516**

[ ] **Eastern Division**
   **3470 Twelfth St., Rm. 134**
   **Riverside, CA 92501**

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARUN BONDALI, Individually and on Behalf of All Others Similarly Situated,<br><br>v.<br><br>PLAINTIFF(S)<br><br>YUMI BRANDS, INC., DAVID C. NOVAK, PATRICK GRISMER, JING-SHYH S. SU and RICHARD T. CARUCCI,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>SACV13 - 00117 JST (JPRx)<br><br><br>SUMMONS |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Shawn A. Williams_____, whose address is _Robbins Geller, One Montgomery Street #1800, San Francisco, CA 94104 415/288-4545__. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __JAN 2 4 2013__

By: _____
DODJIE LAGMAN
Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                                    SUMMONS

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
ARUN BONDALI, Individually and on Behalf of All Others Similarly Situated

**DEFENDANTS**
YUM! BRANDS, INC., DAVID C. NOVAK, PATRICK GRISMER, JING-SHYH S. SU and RICHARD T. CARUCCI

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Shawn A. Williams (213113)     415/233-4545
Robbins Geller Rudman & Dowd LLP
One Montgomery Street, Suite 1800, San Francisco, CA 94104

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☒ Yes   ☐ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. §§78j(b) and 78t(a) Private Securities Litigation Reform Act      COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS — PERSONAL INJURY | TORTS — PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☒ 850 Securities/Commodities/Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**SACV13 - 00117 JST (JPRx)**

FOR OFFICE USE ONLY:     Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
#### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
        ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
        ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
        ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Ventura County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
 **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____ Date January 24, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

CV-71 (05/08)           CIVIL COVER SHEET           Page 2 of 2